## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RUSSELL SHOATZ a/k/a RUSSELL )  Civil Action No. 2: 13-cv-0657
SHOATS, )
 )
Plaintiff, )  United States Magistrate Judge
 )  Cynthia Reed Eddy
v. )
 )
JOHN E. WETZEL, in his individual and )
official capacities as Secretary of the )
Pennsylvania Department of Corrections; )
and LOUIS S. FOLINO, in his individual )
and official capacities as Superintendent of )
the State Correctional Institution at Greene, )
 )
Defendants. )

## MEMORANDUM OPINION AND ORDER

Presently pending are the cross Motions for Summary Judgment filed by the parties (ECF

Nos. 61 and 67). The issues have been fully briefed and the factual record has also been

thoroughly developed. (ECF Nos. 62, 63, 68, 69, 70, 79, 80, 81, 82, 83, 84, and 85). The motion

is ripe for disposition. As will be explained in detail, the Court finds that genuine issues of

material fact exist which preclude the Court from granting summary judgment to either party.[1]

### Factual Background

The summary judgment record before the Court presents two starkly different positions

of why one man spent over two consecutive decades in solitary confinement.[2] The parties agree

---

[1]     All parties have consented to jurisdiction by the undersigned Magistrate Judge. *See* 28 U.S.C. § 636 *et
seq.*; Consent to Trial / Jurisdiction by United States Magistrate Judge (ECF Nos. 9 and 10).

[2]     At the time Plaintiff initiated this lawsuit, he was housed in the Restricted Housing Unit at SCI-Mahanoy
on Restricted Release List status. According to the Declaration Shoatz submitted in support of his motion for
summary judgment, on August 28, 2013, he was transferred to SCI-Frackville, where he was held in solitary
confinement. On September 23, 2013, he was placed in a three-phase step down program, which he successfully
completed on December 17, 2013. On January 14, 2014, he was transferred to SCI-Graterford, where he was held in

1

that since 1974, Plaintiff, Russell Shoatz a/k/a Russell Shoats ("Shoatz"), has been a state

prisoner committed to the custody of the Pennsylvania Department of Corrections ("DOC") and

was held in solitary confinement for over 22 consecutive years (from June 1991 until February

2014).[3]    The parties also agree that Shoatz has a violent criminal history, described as follows

by the United States Court of Appeals for the Third Circuit in *Shoats v. Horn,* 213 F.3d 140, 141

(3d Cir. 2000):

> In 1970, Shoats was convicted of first degree murder for his part in
> an attack on a Philadelphia police guardhouse. Shoats participated
> in the attack as a member of a black revolutionary group that
> sought to eradicate all authority. One police officer was killed and
> another seriously wounded in the attack. Shoats was sentenced to
> life imprisonment. Seven years later, in September 1977, Shoats
> and several other inmates took over a cell block at the Huntingdon
> State Correctional Institution as part of an attempt to escape.
> Shoats injured several guards with a knife, and along with three
> other prisoners, attempted to escape from the prison as planned.
> Two of the inmates were captured immediately and a third was
> killed during the escape. Shoats remained at large until he was
> captured in October 1977.
>
> While Shoats was a fugitive, he entered the home of a prison guard
> and forced him, his wife, and their five year old son to drive him in
> their car to a location outside Cokesburg, Pennsylvania. Shoats
> then ordered the hostages to enter the woods where he left them
> tied to a tree for almost four hours. Shoats was captured, and
> convicted of escape, robbery, kidnapping and simple assault. He
> was later transferred to Fairview State Hospital for the criminally
> insane. In March 1979, Shoats had guns smuggled in to him and
> escaped from that maximum security institution, again taking a

solitary confinement. Approximately one month later, on February 20, 2014, he was released to the general
population at SCI-Graterford. (Declaration of Russell Shoatz, ECF No. 63-1).

[3]     From the summary judgment record, it appears that Shoatz was first placed in solitary confinement in 1980,
upon his capture from his escape from Fairview State Hospital. He was transferred to general population in 1982.
He was returned to solitary confinement during the Spring of 1983 "due to influence within Lifers organization." In
November 1989, Shoatz was temporarily transferred to a federal prison, BOP Leavenworth. While there, he was
initially held in solitary confinement, but then was released to general population. During his time at BOP
Leavenworth, he was placed in solitary confinement on two occasions during investigations being conducted of all
Pennsylvania prisoners who had been transferred to BOP Leavenworth. On both occasions, Shoatz was found to not
have engaged in any rule violations and was released to general population. In June 1991, Shoatz was returned to
SCI-Dallas and was returned to solitary confinement. Shoatz remained in solitary confinement continuously until
February 20, 2014.

2

hostage. In addition to escape and taking hostages, Shoats also has
a history of threatening and assaulting his fellow inmates, and of
causing disruptions at the institutions in which he is incarcerated.

*Id.* at 141. Beyond these facts, the parties agree on little else.

## Standard of Review

Summary judgment is appropriate if the "movant shows that there is no genuine dispute
as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.
56(a). *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986); *Andreoli v. Gates*, 482 F.3d 641, 647
(3d Cir. 2007). A factual dispute is genuine if a reasonable jury could find for the non-moving
party, and is material if it will affect the outcome of the trial under governing substantive law.
*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). At the summary judgment stage, "the
judge's function is not himself to weigh the evidence and determine the truth of the matter but to
determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *see also Marino
v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (a court may not weigh the evidence or
make credibility determinations). Rather, the court must consider all evidence and inferences
drawn therefrom in the light most favorable to the non-moving party. *Andreoli v. Gates*, 482
F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively identify those
portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex*,
477 U.S. at 323–24. The moving party can discharge the burden by showing that "on all the
essential elements of its case on which it bears the burden of proof at trial, no reasonable jury
could find for the non-moving party." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003); *see also
Celotex*, 477 U.S. at 325. If the moving party meets this initial burden, the non-moving party
"must do more than simply show that there is some metaphysical doubt as to material facts," but

3

must show sufficient evidence to support a jury verdict in its favor. *Boyle v. Cty. of Allegheny,* 139 F.3d 386, 393 (3d Cir. 1998) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). However, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." *Celotex Corp.,* 477 U.S. at 322–23; *Jakimas v. Hoffman–La Roche, Inc.,* 485 F.3d 770, 777 (3d Cir. 2007).

Notably, these summary judgment rules do not apply any differently where there are cross-motions pending. *Lawrence v. City of Phila.,* 527 F.3d 299, 310 (3d Cir. 2008). As stated by the Court of Appeals for the Third Circuit, " '[c]ross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.' " *Id.* (quoting *Rains v. Cascade Indus., Inc.,* 402 F.2d 241, 245 (3d Cir. 1968)).

## Discussion

Shoatz argues that Defendants violated the Eighth Amendment's prohibition against cruel and unusual punishment by keeping him in solitary confinement for more than 22 years and that Defendants also deprived him of his substantive and procedural due process rights in violation of the Fourteenth Amendment to the U.S. Constitution. Not surprisingly, Defendants strongly contest all of Shoatz's claims.

4

A.    Statute of Limitations and Exhaustion

Defendants first argue that some of Shoatz's claims are barred by the statute of limitations and/or on the basis that Shoatz did not sufficiently exhaust his administrative remedies under the Prison Litigation Reform Act ("PLRA"). These arguments will be addressed seriatim.

## *Statute of Limitations*

Defendants argue that any claims brought under 42 U.S.C. § 1983 which seek relief for injury which occurred prior to May 8, 2011, are barred by the applicable statute of limitations. It is well established that there is no independent statute of limitations for bringing a claim under 42 U.S.C. § 1983 in federal court. Instead, the United States Court of Appeals for the Third Circuit has determined that "the [forum] state's statute of limitations for personal injury" applies to claims filed under 42 U.S.C. § 1983. *Sameric Corp. of Delaware, Inc. v. City of Phila.*, 142 F.3d 582, 599 (3d Cir. 1988). The statute of limitations for personal injury actions in Pennsylvania is two years. *See* 42 Pa. Cons. Stat. Ann. § 5524.; *Kost v. Kozakiewicz*, 1 F.3d 176, 190 (3d Cir. 1993). A § 1983 cause of action "accrues when the plaintiff knew or should have known of the injury upon which its action is based." *Sameric*, 142 F.3d at 599. However, the continuing violation doctrine must be considered to properly address tolling of the statute of limitations.

The continuing violation theory is an "equitable exception to the timely filing requirement" that applies "when a defendant's conduct is part of a continuing practice." *West v. Phila. Elec. Co.*, 45 F.3d 744, 754 (3d Cir. 1995) (superseded in part by statute, Lilly Ledbetter Fair Pay Act, Pub.L. No. 111–2, 123 Stat. 5 (2009)). This doctrine allows untimely actions to be considered timely "so long as the last act evidencing the continuing practice falls within the

5

limitations period" by instructing the court to "grant relief for the earlier related acts that would otherwise be time barred." *Brenner,* 927 F.2d at 1295. The Court of Appeals for the Third Circuit has held that "[t]o prevail on a continuing violation theory, however, the plaintiff must show more than the occurrence of isolated or sporadic acts . . . ." *Jewett v. Int'l Tel. and Tel. Corp.,* 53 F. 2d 89, 91 (3d Cir. 1981). A "continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation." *Sandutch v. Muroski,* 684 F.2d 252, 254 (3d Cir. 1982) (quoting *Ward v. Caulk,* 650 F.2d 1144, 1147 (9th Cir. 1981)), abrogated on other grounds by *Klehr v. A.O. Smith Corp.,* 521 U.S. 179 (1997).

Our appellate court has also identified three factors for courts to consider when addressing the issue of whether a defendant's acts constitute a continuing practice or sporadic incidents. *Cowell v. Palmer Twp.,* 263 F.3d 286, 292 (3d Cir. 2001). These factors are:

(1) subject matter jurisdiction – whether the violations constitute the same type of discrimination, tending to connect them in a continuing violation; (2) frequency – whether the acts are recurring or more in the nature of isolated incidents; and (3) degree of permanence – whether the act had a degree of permanence which should trigger the plaintiff's awareness of and duty to assert his/her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate. The consideration of 'degree of permanence' is the most important of the factors.

*Id.* Although the continuing violations doctrine has been applied most often to discrimination claims, it is applicable in other contexts, including procedural due process claims brought under § 1983. *Id.* at 292 (citing *Centifanti v. Nix,* 865 F.2d 1422, 1432 – 33 (3d Cir. 1989)).

Shoatz has not alleged a series of distinct alleged wrongs but rather he has alleged that Defendants' conduct is part of a continuing practice. Based on this reasoning, the continuing violations doctrine is appropriate in this context and Shoatz is entitled to bring suit challenging all conduct that was a part of that violation, even conduct that occurred outside the limitations period.

6

*Exhaustion of Administrative Remedies*

The PLRA, 42 U.S.C. § 1997(e)(a), provides as follows:

> No action shall be brought with respect to prison conditions under
> section 1983 of this title by a prisoner confined in jail, prison, or
> other correctional facility until such administrative remedies as are
> available are exhausted.

In sum, the PLRA requires prisoners to completely exhaust their administrative remedies prior to

filing a federal claim. *Jones v. Bock*, 549 U.S. 199, 202-03 (2007). Whether an inmate has

exhausted administrative remedies is a question of law that is to be determined by the court, even

if that determination requires the resolution of disputed facts. *See Small v. Camden Cty*, 728

F.3d 265, 271 (3d Cir. 2013) (judges may resolve factual disputes relevant to the exhaustion

issue without the participation of a jury).

Defendants argue that Shoatz failed to exhaust any claims except for his Fourteenth

Amendment claim related to the appeal of his May 22, 2012, PRC Review. The Court finds that

the summary judgment record does not support Defendants' exhaustion defense. While Shoatz's

appeal clearly challenges the lack of alleged notice and reason for his continued "lockdown," the

appeal also specifically states that the PRC Hearing governed his "continued housing in the

Restricted Housing Unit (RHU) on 23 hour lockdown on the Restricted Release List (RRL)."

The appeal further states that his "20 plus years in the RHU's without one major rule infraction

should have cause them to investigate said records more clearly. . . ." (ECF No. 81-18).

Significantly, the appeal also states as follows:

> Alternatively, I'd ask that you immediately take steps to have me
> removed from the RRL and be allowed into the general prison
> population.

> Otherwise let this Appeal also serve as my Notice that legal action
> will begin to correct the violations of the 8th Amendment's
> prohibition against Cruel and Unusual Punishment, and the 14th

7

> Amendment's Due process and Equal Protection clauses, and
> seeking release from the RHU and monetary damages in my
> situation.

(ECF No. 81-18 at 8) (emphasis added). The Court is unclear of what else Shoatz could have done to grieve his Eighth Amendment issue. Therefore, based on the summary judgment record, the Court must deny Defendants' request for summary judgment on this ground.

## B. Personal Involvement of Defendant Wetzel[4]

Defendant Wetzel argues that he is entitled to the entry of summary judgment because Shoatz has presented insufficient evidence that he was personally involved in the complained of violations of Shoatz's Eighth and Fourteenth Amendment rights. This argument is advanced regardless of the fact that under DOC policy the sole decision-maker in determining whether a prisoner on the RRL will remain in solitary confinement or be released is the Secretary of the DOC.

Defendant Wetzel testified in his deposition that he was aware of his role as the sole decision-maker regarding the solitary confinement of Shoatz and he acknowledged that he could have initiated a review of any RRL prisoner's solitary confinement at any time. The summary judgment record also establishes that Defendant Wetzel had been contacted repeatedly by Shoatz's family members and other advocates who advised him that Shoatz "has suffered severe psychological anguish and his physical health has been worsened by the stress of prolonged isolation." In fact, in June 2012, Defendant Wetzel personally met with Theresa Shoatz (Shoatz's daughter), Heidi Boghossian (Executive Director of National Lawyers Guild), and Bret Grote, Esquire, to discuss Shoatz's prolonged solitary confinement and its negative impact on

---

[4]    After the filing of Defendants' motion for summary judgment, Plaintiff voluntarily withdrew his claims against Defendant Kerestes; by Text Order of February 1, 2016, Defendant Kerestes was dismissed from this case. (ECF No. 86).

Shoatz's health and well-being. (Wetzel Deposition 19:16 – 20:6, 23:22-24:8; 28:4-6, 52:9-53:6; 138:1-25; 139: 1-17).

This evidence is sufficient to present a genuine issue of material fact for jury consideration.

## C.    Eighth Amendment Claims

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII; *Whitley v. Albers*, 475 U.S. 312, 318-19 (1986). The United States Supreme Court has interpreted this prohibition to impose affirmative duties on prison officials to "provide humane conditions of confinement." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Allah v. Bartkowski,* 574 F. App'x 135, 138 (3d Cir. 2014) (quoting *Betts v. New Castle Youth Dev. Ctrs.*, 621 F.3d 249, 256 (3d Cir. 2010)). When an Eighth Amendment claim arises in the context of a challenge to conditions of confinement, the relevant inquiry is whether the prisoner has been deprived of the "minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981); *Atkinson v. Taylor*, 316 F.3d 257, 272 (3d Cir. 2003). A prisoner must establish that he has been denied "basic human needs, such as food, clothing, shelter, sanitation, medical care and personal safety" from physical assault. *Griffin v. Vaughn*, 112 F.3d 703, 709 (3d Cir. 1997).

In order to succeed on an Eighth Amendment conditions of confinement claim, a plaintiff must demonstrate both that he has been denied "the minimal civilized measure of life's necessities" and that this was done while defendants had a "sufficiently culpable state of mind." *Farmer,* 511 U.S. at 834. With respect to the first requirement, conditions cited by an inmate must be "objectively, sufficiently serious [and] must result in the denial of the minimal civilized measure of life's necessities." *Id.* (internal citation and quotation omitted). Only "extreme

9

deprivations" are sufficient to make out a conditions of confinement claim. *Hudson v. McMillen*, 503 U.S. 1, 8–9 (1992). There is no static test for determining whether conditions are "cruel and unusual." Instead, the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Rhodes v. Chapman,* 452 U.S. 337, 346 (1981) (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)). A plaintiff must prove that the deprivation is sufficiently serious when viewed within the context of "contemporary standards of decency."[5] *Helling v. McKinney*, 509 U.S. 25, 36 (1993); *see also Farmer*, 511 U.S. at 833-34. "Some conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produced the deprivation of a single, identifiable human need such as food, warmth, or exercise . . . ." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (emphasis in original).

---

[5]   In June, 2015, Justice Kennedy in a concurring opinion in a recent capital case, *Davis v. Ayala*, ---- U.S. ---, 135 S. Ct. 2187 (2015), spoke out on the issue of solitary confinement even though it admittedly had "no direct bearing on the precise legal questions presented by this case." *Id.* at 2208. Ayala had "served the great majority of his more than 25 years in custody in 'administrative segregation' or, as it is better known, solitary confinement." *Id.* Justice Kennedy noted:

> The human toll wrought by extended terms of isolation long has been understood, and questioned by writers and commentators . . . . One hundred and twenty-five years ago, this Court recognized that, even for prisoners sentenced to death, solitary confinement bears 'a further terror and peculiar mark of infamy.' *In re Medley*, 134 U.S. 160, 170 (1890); *see also id.*, at 168, 10 S.Ct. 384 ("A considerable number of the prisoners fell, after even a short [solitary] confinement, into a semi-fatuous condition . . . and others become violently insane; others, still committed suicide"). . . There are indications of a new and growing awareness in the broader public of the subject of corrections and of solitary confinement in particular. (internal citations omitted). . . Of course, prison officials must have discretion to decide that in some instances temporary, solitary confinement is a useful or necessary means to impose discipline and to protect prison employees and other inmates. But research still confirms what this Court suggested over a century ago: Years on end of near-total isolation exact a terrible price. . . See, e.g., Grassian, Psychiatric Effects of Solitary Confinement, 22 Wash. U.J.L. & Pol'y 325 (2006) (common side effects of solitary confinement include anxiety, panic, withdrawal, hallucinations, self-mutilation, and suicidal thoughts and behaviors).

*Davis*, 135 S.Ct. at 2209 – 2210.

It is well established that the Eighth Amendment protects not only inmates' physical

health, but their mental health as well.[6] As the Court of Appeals for the Third Circuit stated,

> The touchstone is the health of the inmate. While the prison
> administration may punish, it may not do so in a manner that
> threatens the physical and mental health of prisoners.
>
> There is a fundamental difference between depriving a prisoner of
> privileges he may enjoy and depriving him of the basic necessities
> of human existence. Isolation may differ from normal confinement
> only in the loss of freedom and privileges permitted to other
> prisoners. The duration and conditions of confinement cannot be
> ignored in deciding whether such confinement meets constitutional
> standards.

*Young v. Quinlan,* 960 F.2d 351, 364 (3d Cir. 1992) (reversed on other grounds) (emphasis

added).

With respect to the second element, an inmate must demonstrate deliberate indifference

to prison conditions on the part of prison officials. *Farmer*, 511 U.S. at 833; *Wilson*, 501 U.S. at

297; *Rhodes,* 452 U.S. at 347. This requires a court to determine, subjectively, whether the

officials acted with a sufficiently culpable state of mind. *Id.*

> [A] prison official cannot be found liable under the Eighth
> Amendment for denying an inmate humane conditions of
> confinement unless the official knows of and disregards an
> excessive risk to inmate health or safety; the official must both be
> aware of facts from which the inference could be drawn that a
> substantial risk of serious harm exists, and he must also draw the
> inference. . . . The Eighth Amendment does not outlaw cruel and
> unusual "conditions"; it outlaws cruel and unusual "punishments."

---

6   On February 24, 2015, the Civil Rights Division of the Department of Justice issued its final investigative
report entitled "Investigation of the Pennsylvania Department of Corrections' Use of Solitary Confinement on
Prisoners with Serious Mental Illness and/or Intellectual Disabilities," detailing "the dehumanizing and cruel
conditions that attend the Pennsylvania Department of Corrections' ("DOC") use of solitary confinement at six
prison facilities, including SCI-Greene, where prisoners are reportedly confined to a cell, less than 100 square feet,
for twenty-three hours a day, exposed to unsanitary and inhospitable conditions, and subjected to the excessive use
of restraints." *Young v. Martin*, 801 F.3d 172, 183-84 (3d Cir. 2015) (Report posted on the DOJ website at
www.justice.gov/sites/default/files/crt/legacy/2014/02/25/pdoc_finding_2-24-14.pdf). The report "concludes that the
long-term use of solitary confinement on mentally ill prisoners 'violate[s] the Eighth Amendment's prohibition
against 'cruel and unusual punishments'." *Id.* (citing DOJ investigative report at 3).

*Farmer,* 511 U.S. at 838. Thus, a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. A trier of fact may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious. *Id.* at 842.

With this standard in mind, the Court turns to Shoatz's claims that as a result of his prolonged solitary confinement he suffered violations of his rights under the Eighth Amendment.

### Was Shoatz Subjected To A Sufficiently Serious Condition

Shoatz alleges that his prolonged years in solitary confinement deprived him of social interaction, environmental stimulation, and mental health. Defendants argue that the Supreme Court has yet to conclude that long term segregation in and of itself violates the Eighth Amendment and that the "essence of Shoatz's Eighth Amendment claim is that he was subjected to the same conditions generally applicable to all inmates on AC status in DOC Restricted Housing Unit." (Defs' Br. in Supp. of Mot. for Summ. J. at 17, ECF No. 68).

According to Shoatz, his prolonged solitary confinement caused him to "experience serious mental health harms, including years of chronic depression, bouts of suicidal ideation, high levels of anxiety, severe difficulty concentrating, short term memory loss, fear of leaving his cell, depression, emotional numbing, and an inability to form intimate relationships. (Pl's Brief in Support of Mot for Summ. J. at 6 , ECF No. 62). In support of this allegation, Plaintiff has submitted evidence in the form of an expert's report by James Gilligan, M.D., a board certified psychiatrist. According to Dr. Gilligan since leaving solitary confinement, Shoatz exhibits symptoms of "depression and of post-traumatic stress." (Expert Report of Dr. James Gilligan, ECF No. 63-6, at 15). He further opined as follows,

12

> But I believe that his emotional numbing and incapacity for
> intimacy, both of which are among the primary symptoms of post-
> traumatic stress syndromes, are the most serious and disabling
> symptoms of psychopathology from which he suffers. And both of
> these symptoms would appear to be direct sequelae of having spent
> virtually his entire adult life in complete and coerced social
> isolation (and sensory deprivation) – which is among the most
> abnormal and pathogenic environments in which it is possible to
> place a human being.

*Id.* Shoatz argues that his extraordinary length of solitary confinement deprived him of basic human needs and thus exposed him to a substantial risk of medical harm. (Pl's Br. in Support of Mot for Summ J. at 4 – 9 , ECF No. 62). The summary judgment record reflects that at least since December of 2008, Shoatz was inquiring of the mental health staff at SCI-Greene about the possible health effects of long term restrictive housing. For example, Shoatz argues that Defendants deprived him of sleep, one of life's basic needs. He alleges that he suffered chronic insomnia for at least the last six years while he was incarcerated at SCI-Greene and "[h]is inability to sleep was exacerbated by Defendants leaving a light on in his cell 24 hours per day." *Id.* at 8.

Shoatz also alleges that his prolonged years in solitary confinement deprived him of physical health and exercise. *See Wilson v. Seiter*, 501 294, 304 (1991) (citing *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979) (outdoor exercise required when prisoners otherwise confined in small cells almost 24 hours per day)). Shoatz was permitted to enter the exercise cage five hours per week. Each time Shoatz left his cell he was subjected to what he describes as "visual strip-searches." After three years, Shoatz began going to the exercise cage only once or twice per week because he feared the degrading strip-searches.

Shoatz has also submitted evidence in the form of an expert's report by Juan E. Mendez, the United Nations Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading

Treatment or Punishment, an expert on international standards applicable to prolonged solitary

confinement. Mr. Mendez opined as follows:

> the conditions of detention of Mr. Russell Shoatz, in particular his indefinite solitary confinement eventually lasting 29 years, constituted cruel, inhuman or degrading punishment under customary international law standards. . . . [E]ven if isolation of inmates is not per se contrary to those practices, indefinite or excessively prolonged regimes of solitary confinement like the one suffered by Mr. Shoatz certainly do. In addition to the excessive duration and indefinite nature, his isolation contradicts the trend of all civilized Nations in that it was imposed on the basis of status determinations unrelated to any conduct in his part, and through a meaningless procedure that did not afford him a serious chance to challenge the outcome.

(Expert Testimony of Juan E. Mendez, ECF No. 63-8 at $11 - 12$).

While Shoatz may have been subjected to the same conditions as other inmates on administrative custody status, the fact remains that Shoatz endured these conditions for 22 consecutive years. As the Supreme Court stated in *Hutto*, solitary confinement may be unconstitutional "depending on the duration of the confinement and the conditions thereof." *Hutto*, 437 U.S. at 685-86. Therefore, the Court finds that for purposes of this motion, Shoatz has produced sufficient evidence for a reasonable fact finder to determine that the cumulative effect of over 22 years in consecutive solitary confinement constitutes a sufficiently serious deprivation of at least one basic human need, including but not limited to sleep, exercise, social contact and environmental stimulation. It is obvious that being housed in isolation in a tiny cell for 23 hours a day for over two decades results in serious deprivations of basic human needs. Thus, the Court finds that the objective prong of the *Farmer* test has been satisfied.

*Were The Prison Officials "Deliberately Indifferent" To The Risk of Harm*

In *Farmer,* the Supreme Court defined "deliberate indifference" in the context of conditions of confinement as follows:

> We hold . . . that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. This approach comports best with the text of the Amendment as our cases have interpreted it. The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments."

*Farmer,* 511 U.S. at 837. The Supreme Court further clarified in *Hope v. Pelzer*, 536 U.S. 730, 738 (2002), that courts "may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious."

Shoatz argues that Defendants knew the risks associated with prolonged isolation and knew that Shoatz in particular was suffering from his prolonged isolation, yet did nothing to abate his situation. Defendants argue that "while the summary judgment shows that the Corrections Defendants were certainly aware that Shoatz was confined in the Restricted Housing Unit under the prevailing conditions of the DOC's Administrative Custody regime – and that they were generally aware of what such conditions entailed – there is no evidence in the summary judgment record to establish that any of the Corrections Defendants believed that these conditions were harming Shoatz to the point of an Eighth Amendment violation. Rather, the evidence is to the contrary." (Defs' Br. at 26, ECF No. 68).

In his deposition, Defendant Folino admitted that he has known since the mid-1980s that prisoners are at a greater risk of psychological harm the longer they remain in solitary confinement. (Folino Dep. at 45:10 – 47:24). Defendant Folino also testified that he was aware

15

that Shoatz had not had a psychological review for at least 10 years prior to his 2010 psychological review. The summary judgment record evidence reflects that Defendant Folino knew of the risks and harms faced by Shoatz from letters, emails, and phone calls from family and other advocates seeking Shoatz's release from solitary confinement.

The summary judgment record demonstrates that Defendant Wetzel was similarly aware of the general risks inherent in prolonged solitary confinement and specifically aware of Shoatz's situation. Defendant Wetzel was contacted repeatedly by family members of Shoatz and other advocates who informed Defendant Wetzel that Shoatz was suffering severe psychological anguish and his physical health had worsened by the stress of prolonged isolation. Defendant Wetzel also testified that he was aware that cell-side visits by mental health staff with RHU inmates were flawed and that the DOC policy has since been changed to correct this problem.

As I noted in my memorandum opinion denying Defendants' motion to dismiss, "as one district court observed 'a conclusion . . . that prolonged isolation from social and environmental stimulation increases the risk of development of mental illness does not strike this court as rocket science'." *Shoatz v. Wetzel,* 2014 WL 294988, at *4, n.3 (W.D.Pa. Jan. 27, 2014) (quoting *McClary v. Kelly,* 4 F. Supp.2d 195, 209 (W.D.N.Y. 1998), ECF No. 29); *Wilkerson v. Stalder,* 639 F. Supp.2d 654, 680 (M.D.La. 2007) ("[a]ny person in the United States who reads or watches television should be aware that lack of adequate exercise, sleep, social isolation, and lack of environmental stimulation are seriously detrimental to a human being's physical and mental health."). Accordingly, the Court finds that Shoatz has introduced evidence sufficient to allow a reasonable fact finder to find that Defendants were deliberately indifferent to the health and safety of Shoatz in continuing to impose the condition of prolonged solitary confinement. It will be for the jury to make the necessary credibility determinations.

## D. Fourteenth Amendment Claims

The Fourteenth Amendment prohibits a state from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. To the extent Shoatz is attempting to assert a substantive due process claim, he must prove that he was deprived of a protected property interest by arbitrary or capricious government action. *See Sameric Corp. v. City of Philadelphia*, 142 F.3d 582, 590 (3d Cir. 1998). Similarly, "[a] procedural due process analysis involves a two-step inquiry: (1) does the complaining party have a protected liberty or property interest and, if so, (2) does the available process comport with all constitutional requirements." *Bowen v. Ryan*, 2006 WL 3437287 (M.D.Pa. Nov. 29, 2006), *aff'd*, 248 F. App'x 302 (3d Cir. 2007); *see also Shoats v. Horn*, 213 F.3d 140, 143 (3d Cir. 2000) ("*Shoats I*").

As this Court noted in its adjudication of Defendants' motion to dismiss, Shoatz's claim is determined by reference to the Court of Appeals for the Third Circuit's decision in *Shoats I.* In that case, our court of appeals found that Shoatz's virtual isolation for eight years clearly gave rise to procedural due process protections under the analysis mandated by *Sandin v. Conner*, 515 U.S. 472, 484 (1995). Nonetheless, relying upon *Hewitt,* 459 U.S. 460 (1983), the court of appeals found that informal, periodic review of Shoatz's administrative custody satisfied the requirements of due process. *Shoats I*, 213 F.3d at 147.

The Court can easily find that Shoatz's continued solitary confinement for over 22 years satisfies the requirement that a liberty interest is implicated, but that finding does not end the inquiry for purposes of procedural process.[7] *See also Bowen v. Ryan*, 248 F. App'x 302, 304-05

---

[7]    Defendants argue that Shoatz's placement on the Restricted Release List ("RRL") does not implicate a constitutionally protected due process right. If Shoatz were challenging his placement on the RRL, Defendants would be correct. *See Huertas v. Sec'y Dept. of Corrections*, 533 F. Appx. 64, 67 n. 6 (3d Cir. 2013) (finding that placement on the RRL does not implicate a constitutionally protected due process right.) However, the summary judgment record reflects that Shoatz is not contesting his placement on the RRL; rather, he is pursuing an "as applied" challenge, particular to his situation.

(3d Cir. 2007) ("[T]wenty years in administrative custody is clearly an atypical and significant hardship sufficient to trigger the procedural protections of the Due Process Clause, implicating a liberty interest within the contemplation of the Fourteenth Amendment. . . ."). The question then becomes does the available process comport with all constitutional requirements. Such process must include "some notice of the charges against [a prisoner] and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative custody." *Shoats I*, 213 F.3d at 145 (quoting *Hewitt v. Helms*, 459 U.S. 460, 476 (1983)).

In 2004, four years after the decision in *Shoats I,* the DOC instituted the Restricted Release List ("RRL"), a process for designating certain prisoners for indefinite solitary confinement. The Secretary of the DOC is the final decision maker as to whether a prisoner gets placed on the RRL, whether the prisoner remains on the RRL, and whether the prisoner is removed from the RRL.

Shoatz was placed on the RRL at its inception. It is not his initial placement on the RRL which he now challenges; rather, he challenges the periodic review process he received while on the RRL. Until October 2012, prisoners on the RRL did not receive a mandatory review of their RRL status. Review of an RRL prisoner's classification was discretionary, which meant the Secretary would not review or assess a prisoner's RRL status unless the Superintendent of the prison recommended that the prisoner be removed from the RRL. (ECF No. 63, Exh. 15, DC-ADM 802 §§ 1(B), 4(B) (effective date June 13, 2008); Exh. 16, DC-ADM 802 §§ 1(B), 2(D), 4(B) (effective date June 7, 2011)). According to Shoatz, no Superintendent reviewed his RRL status until February 2014.

Shoatz alleges that Defendants violated his rights under the Due Process Clause of the Fourteenth Amendment as follows:

> 1. The Program Review Committee ("PRC") lacked the authority to remove Shoatz from solitary confinement on RRL status, never considered the appropriateness of his continuing solitary confinement on RRL status, and failed to provide Shoatz with the rationale for his continued solitary confinement;
>
> 2. The reviews conducted in 2010 and 2012 at SCI Green were deficient because Shoatz was not notified in advance when they were occurring, was not permitted to participate, was not informed of the rationale sustaining his solitary confinement; and the ultimate decision-maker, the DOC secretary, did not participate;
>
> 3. Folino categorically refused to consider changed circumstances in assessing the justification for Shoatz's solitary confinement; and
>
> 4. Shoatz was not reviewed by the sole decision-maker regarding his solitary confinement, the DOC secretary, until February 2014.

(Pl's Br. in Supp. of Pl's Mot. for Summ. Judg., at 15, ECF No. 62D; Pl's Br. in Opp'n to Defs' Mot for Summ. J. at 15 – 16, ECF No. 79). Defendants respond that the fact that Shoatz was on the RRL does not change the analysis of the issue – he was afforded all the process he was due when he was given periodic reviews of his custody status. (Defs' Br. at 34, ECF No. 68).

The essential elements of minimal due process required in the prison environment are easily satisfied by the detailed policies and procedures which control the placement of inmates in administrative segregation in Pennsylvania state prisons. Whether those policies and procedures were followed in a meaningful manner is disputed by the parties. While it is for the Court to determine what process was due Shoatz, it is for the jury to decide whether he received that process.

E.    Qualified Immunity

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a

19

reasonable person would have known." *Mullenix v. Luna,* -- U.S. ---, 136 S.Ct. 305, 308 (2015) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.' " *Id.* (quoting *Reichle v. Howards*, 566 U.S. ---, 132 S.Ct. 2088, 2093 (2012)). The Supreme Court of the United States has stated that it does " 'not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.' " *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Courts are not to define clearly established law at a high level of generality; rather "[t]he dispositive question is 'whether the violative nature of particular conduct is clearly established.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 742). "This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 2004 (per curiam) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Therefore, to determine qualified immunity, the court must consider whether the facts alleged, taken in the light most favorable to the plaintiff, "show the officer's conduct violated a constitutional right," and also "ask whether the right was clearly established." *Saucier,* 533 U.S. at 201.

In the case *sub judice*, Defendants claim that they are entitled to qualified immunity on any Eighth Amendment conditions of confinement claim or Fourteenth Amendment due process claim asserted by Shoatz. Defendants argue that: (1) they did not violate Shoatz's constitutional rights, (2) "there has been no case which has clearly established an inmate's right not to be held

20

in solitary confinement for an extended period of time," (3) "there has been no case decided which has clearly established than an inmate has a liberty interest arising from placement on the DOC's Restricted Release under the terms of the DOC's DC-ADM 802 policy; and (4) "there has been no case decided which has clearly established that the due process protections established by the DOC's DC-ADM 802 policy for inmates confined in Administrative Custody status . . . violates the due process clause of the Fourteenth Amendment, even where the inmate claims that such reviews are perfunctory or cursory." (Def's Br. at 40-41, ECF No. 68).

Shoatz responds that Defendants mischaracterize his claims as facial challenges, when in fact his challenges are "as-applied" challenges, particular to his situation. As Shoatz explains, "He does not contest RHU conditions generally. He does not contest his placement on the RRL. And he does not contest the constitutionality of the DOC's DC-ADM 802 policy." (Pl's Br. in Opp'n, at 31, ECF No. 79).

The Court agrees with Shoatz's position on this issue. As our Court of Appeals recognized in *Young v. Quinlan*, 960 F.2d 351, 363-64 (3d Cir. 1992), superseded by statute on other grounds as stated in *Ghana v. Holland*, 226 F.3d 175, 184 (3d Cir. 2000),

> Segregated detention is not cruel and unusual punishment *per se*, as long as the conditions of confinement are not foul, inhuman or totally without penological justification. (internal citations omitted). It may be a necessary tool of prison discipline, both to punish infractions and to control and perhaps protect inmates whose presence within the general population would create unmanageable risks. (internal citations omitted). Courts, though, have universally condemned conditions of segregation inimicable to the inmate-occupants' physical health, and, in some instances, have also considered conditions that jeopardize the mental health or stability of the inmates so confined. The touchstone is the health of the inmate. While the prison administration may punish, it may not do so in a manner that threatens the physical and mental health of prisoners. *See Hutto [v. Finney*, 437 U.S. 678, 685-87 (1978)]; *Peterkin v. Jeffes*, 855 F.2d 1021, 1029-30 (3d Cir. 1988)].

The law with regard to the deliberate indifference standard has been clear since at least

1976, when the United States Supreme Court decided *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). Furthermore, in 1978, the Supreme Court stated that "[c]onfinement in a prison or in an isolation cell is a form of punishment subject to scrutiny under Eighth Amendment standards." *Hutto v. Finney*, 437 U.S. 678, 685 (1978). In *Hutto*, the Court explained that "punitive isolation is not necessarily unconstitutional, but it may be, depending on the duration of the confinement and the conditions thereof." *Id.* at 686 ("[T]he length of time each inmate spent in isolation was simply one consideration among many"). *See also In re Medley*, 134 U.S. 160, 168 (1890) (recognizing that in solitary confinement "[a] considerable number of the prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide[.]".)

The summary judgment record, when viewed in the light most favorable to Shoatz, raises genuine issues of material fact as to whether Defendants violated the Eighth Amendment in light of clearly established case law which prohibits deliberate indifference to prisoner health, the recognized risks and harms of solitary confinement, and the requirement to consider the duration of solitary confinement.

Similarly, Shoatz has presented sufficient evidence to preclude a finding of qualified immunity on his due process claims. Shoatz is not claiming a liberty interest because he was placed on the RRL nor is he making a facial challenge to DOC policy. Rather, as he explains, Shoatz has raised an as applied challenge to the deprivation of his liberty interest through the failure to provide notice and a meaningful opportunity to be heard and challenge his prolonged solitary confinement and to the "conscience-shocking" decisions to continue him in solitary confinement for an exceptionally long period of time without providing sufficient procedural protections.

22

In 2000, our court of appeals held that eight years in administrative custody, where, for example, an inmate is confined to his cell for 23 hours each day, eats meals by himself, and is prohibited from participating in organization activities, is atypical and implicates a protected liberty interest. *Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2000). The appellate court also stated that an "informal, nonadversary review at which the prisoner has the opportunity to state his views satisfies the requires of due process." *Id.* at 144 (quoting *Hewitt v. Helms*, 459 U.S. 460, 476 (1983)). The procedures afforded, or more specifically the alleged lack thereof, is the crux of Shoatz's due process claims in this litigation.

The law with regard to the due process required when a prisoner's liberty interest is at stake has been clear since at least 1983, when the Supreme Court decided *Hewitt v. Helms*, 459 U.S. 460 (1983). The summary judgment record, when viewed in the light most favorable to Shoatz, raises genuine issues of material fact as to whether Shoatz's has been deprived of the process he is due under the Fourteenth Amendment.

Given the summary judgment record presented, at this stage of the litigation, the Court finds that Defendants are not entitled to qualified immunity.

F. Injunctive Relief

Defendants argue that because Shoatz has been transferred to SCI-Graterford, his claims for injunctive relief are moot. Shoatz concedes that his claim for injunctive relief against Defendant Folino is mooted by his transfer and Defendant Folino's retirement. (Pl's Br. in Opp'n, at n.5, ECF No. 79). However, Shoatz argues that the DOC's underlying conduct and/or policies remain at issue and, thus, his claims for injunctive relief against those policies are not moot. The Court finds Shoatz's argument persuasive. Because Defendant Wetzel has a position of state-wide authority in the DOC and thus Shoatz's transfer to another prison within the DOC

23

does not take him outside of Defendant Wetzel's control, the Court finds that claims for injunctive relief against Defendant Wetzel are not moot. *See Mohammad v. Kelchner*, No. 303cv1134, 2005 WL 1138468, \*7 (M.D. Pa. Apr. 27, 2005); *Dantzler v. Beard*, No. 09-275, 2010 WL 1008294, \*11 n.10 (W.D. Pa. Mar. 15, 2010).

## Conclusion

The evidence presented in the summary judgment record is wide-ranging, and it bears emphasizing that this Court's findings are limited to the particular facts involving Russell Shoatz a/k/a Russell Shoats. As stated at the outset of this Memorandum Opinion, the parties are in disagreement about the vast majority of the issues raised in this lawsuit, which results in the existence of genuine issues of material fact. It is for a jury to decide these factual issues.

An appropriate Order follows.

**AND NOW**, this 12th day of February, 2016,

For the reasons set forth in the Memorandum Opinion, it is hereby **ORDERED** that Plaintiff's Motion for Summary Judgment is **DENIED** and Defendants' Motion for Summary Judgment also is **DENIED** as the Court finds that disputes of material fact exist which must be resolved by a jury.

Cynthia Reed Eddy
United States Magistrate Judge

cc:  Richard L. Etter
     Reed Smith LLP
     (via CM/ECF electronic notification)

     Stefanie Lepore Burt
     Reed Smith LLP
     (via CM/ECF electronic notification)

     Bret Grote
     Abolitionist Law Center
     (via CM/ECF electronic notification)

     Daniel M. Kovalik
     United Steelworkers of America
     (via CM/ECF electronic notification)

     Dustin McDaniel
     Abolitionist Law Center
     (via CM/ECF electronic notification)

     Harold J. Engel
     (via CM/ECF electronic notification)

     Mary Lynch Friedline
     Office of Attorney General
     (via CM/ECF electronic notification)

     Scott A. Bradley
     Office of the Attorney General
     (via CM/ECF electronic notification)

     Yana L. Warshafsky
     Office of the Attorney General
     (via CM/ECF electronic notification)